***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. An employee-employer relationship existed between Plaintiff and US Airways, Inc.
3. US Airways, Inc. was the duly qualified employer at the time of the alleged incident.
4. Plaintiff's date of injury was April 25, 1995.
5. Plaintiff's compensation rate is $478.00.
6. In November 2002, Defendants advanced Plaintiff the sum of $2,000.00 against future benefits, for which Defendants are entitled to a credit.
 ***********
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was forty-four years of age. At the time of his injury on April 25, 1995, Plaintiff was employed by US Airways as a lead mechanic on the eleven o'clock in the morning to seven o'clock in the evening shift. Plaintiff was injured in the course and scope of his employment when he slipped and fell, injuring his neck. Defendants accepted this claim as compensable.
2. Plaintiff's job as a lead mechanic involved repair, and maintenance of commercial aircraft. This job also required Plaintiff to perform inspections and process paperwork.
3. After his injury, Plaintiff returned to work for Defendant-Employer in May 1999, with restrictions on work that would have required him to look up or perform overhead work. Dr. Timothy Garner, the treating neurosurgeon, approved a written job description for Plaintiff in April 1999 or May 1999, which included repair and revision of aircraft manuals; perform a monthly station and fire extinguisher audit; check and inventory material levels for nut and bolt stock, inventory ground support equipment stock, and order parts; man phones, take messages, and sort mail; research, look for parts for other mechanics; assist with trouble shooting aircraft problems based on experience; train other station personnel for safety, "haz mat, jetways, etc;" inventory and set up training videos, accomplish minor repairs and corrective action to items found during audit; accomplish visual only checks on overnight aircraft (i.e. exterior lights); check aircraft and cabin log books for discrepancies; input information into computer; check and audit microfilm and manual tapes for compliance; and sort miscellaneous mixed aircraft hardware (i.e. bolts, screws, etc.). Plaintiff continued to work within those restrictions until January 2001.
4. In January 2001, Dr. Garner performed a second cervical fusion due to Plaintiff's 1995 work-related injury. Plaintiff had previously undergone a cervical fusion in August 1995 due to his work-related 1995 injury. After the January 2001 fusion, Dr. Garner allowed Plaintiff to return to work, with the same light duty, limited work restrictions, as had been in place since 1999. Plaintiff continued to perform his job as a lead mechanic, with the specified modifications of no repetitive overhead work or looking up. Plaintiff continued to miss work due to medical treatment or problems related to his injury and his work restrictions were modified to sedentary work as of August 9, 2002. On his August 9, 2002 medical report to US Airways, Dr. Joan D. Potter stated that Plaintiff was to engage in sedentary work only as of August 9, 2002. She further noted Plaintiff was unable to drive himself to work and his "sedating meds make adequate safe performance of job as airline mechanic extremely unlikely." Dr. Potter further stated that `Patient only capable of doing extremely simple task on current meds. No climbing. No lifting pushing or pulling more that 5 lbs. Not safe to drive or operate equipment."
5. Mike Herron, Plaintiff's supervisor since the year 2000, was the Production Supervisor for Line Maintenance for US Airways in Raleigh, North Carolina. Mr. Herron informed Plaintiff on numerous occasions that when Plaintiff claimed that an absence was due to his work-related injury, he was required to provide a medical note for the absence. Plaintiff understood that he was required to provide a doctor's note when he missed work due to his work-related injury, and Plaintiff acknowledged that he had discussed this issue with Mr. Herron.
6. Plaintiff was working without missing much time through early 2002. Although the record does not clearly indicate when Dr. Garner took Plaintiff out of work; on July 31, 2002, Dr. Garner returned the Plaintiff to work effective August 4, 2002, with the same restrictions. In the middle of November 2002, Plaintiff began to have more pain and became unable to work. During 2002, Plaintiff continued to treat with Dr. Garner.
7. On November 13, 2002, Dr. Garner again saw Plaintiff, and did not take Plaintiff out of work at that time, although he noted that Plaintiff was "miserable" and was being transported to work because the narcotic pain medications that he was taking at the time made it unsafe for him to drive.
8. Plaintiff continued to miss time from work for which he did not produce the medical documentation required by Defendant-Employer. As a result of his failure to provide the required medical notes and excessive absences, Plaintiff was terminated on December 2, 2002.
9. During the nine month period before Plaintiff was terminated, he tried numerous medication and treatment modalities to lessen his pain, including injections, and use of a duragesic patch. Plaintiff was also recommended implantation of a spinal stimulator. Plaintiff did not receive significant relief from use of medication and the numerated treatment modalities.
10. The Full Commission finds that Plaintiff's termination was related to his compensable injury. Plaintiff testified, and the Full Commission finds as credible, that Plaintiff had a difficult time making appointments with his doctors because he worked third shift and usually had to wait a week or more before being able to visit with the doctor. Plaintiff's termination was due to his physical condition as a result of his compensable injury by accident.
11. On December 12, 2002, Plaintiff returned to Dr. Garner. In his medical note, Dr. Garner noted that Plaintiff had been terminated and that the Plaintiff was "not capable of doing that job at this point." Dr. Garner noted that Plaintiff continued to have problems at the C6-7 level that had been fused and could not be fixed surgically. Dr. Garner further stated in his December 12, 2002 medical note:
 He tells me that he was recently terminated by his employer. While that's bad particularly at this time of year, I'm somewhat relieved by that in that I've thought for a long time that his work that he was persistently trying to do was an aggravating factor and was continually causing him pain that now hopefully we can eliminate. I've told him several times before that I did not think that he should be doing airline mechanic work and certainly I think he's not capable of doing that job at this point.
12. Dr. Garner was of the opinion that Plaintiff continued to have neck problems despite two successful surgeries. Dr. Garner also opined that Plaintiff had a high motivation to return to work, even though the job was an aggravating and a continual irritative force that made treatments more intense and necessary.
13. Dr. Garner testified, however, that he did not think pain could become so debilitating that he would restrict a patient from a job, but Plaintiff was close to meeting this test. Dr. Garner further testified he was not sure whether the Commission recognizes pain as a criterion for determining disability. Dr. Garner was of the opinion that it is rare to take a patient out of work for pain alone, but if Plaintiff had come to him and said he had done everything he could do, the pain was killing him, he was okay when not at work, but hurt when at work; he would have considered taking Plaintiff out of work. Dr. Garner testified that he was not aware how much time Plaintiff had missed from work, but Plaintiff would not have been able to get absence notes from him because he was not Plaintiff's primary care physician.
14. When asked hypothetically, in considering Plaintiff's termination due to attendance issues and the lack of doctor's notes, did he still think Plaintiff could do the job five days per week, full time, Dr. Garner answered, "No," he had to revisit the issue.
15. Based on Plaintiff's testimony, which the Full Commission finds credible, Plaintiff did everything he could do to continue to work, but the pain was so severe ("killing him") on some days that he could not work and his attempts to work worsened his pain. Therefore, Plaintiff has meet Dr. Garner's criteria for consideration for taking a patient out of work and Plaintiff was medically unable to work as of December 2, 2002.
16. Dr. Richard Osenbach, a neurosurgeon with a subspecialty in pain management and surgery, testified that he saw Plaintiff in January 2004, on referral from Dr. Robert Paul Rieker, Jr., for implanting a permanent spinal cord stimulator in Plaintiff's neck. Dr. Rieker performed the trial test and determined whether a permanent implant would be beneficial. Dr. Osenbach agreed with Dr. Rieker's recommendation to implant a permanent spinal cord stimulator.
17. Dr. Osenbach testified that Plaintiff reported at least a fifty percent reduction in pain during the five-day trial. Plaintiff was reluctant to have the temporary stimulator removed because it was helping with the pain so well. On April 1, 2004, Dr. Osenbach implanted the permanent stimulator.
18. Dr. Osenbach testified that the stimulator works by stimulating certain nerve fibers, helping to block pain signals that are transmitted to the brain. Within the first several months after installing the stimulator patients are not supposed to do repetitive movements. After a few months, if doing well, patients can do anything they want.
19. Dr. Osenbach has not released Plaintiff to return to work, as he is not Plaintiff's primary care or pain management physician. Plaintiff was under work restrictions until July 13, 2004, because of surgery due to implantation of the permanent stimulator. Customarily, after three months, patients are released to return to work, depending on the patient's job description. Dr. Osenbach testified at his July 9, 2004 deposition that he plans to see Plaintiff at six, twelve, and twenty-four months to keep track of his progress. Dr. Osenbach further testified that he would not make the decision for Plaintiff to return to work, and would rather have a patient have an IME or FCE for an objective opinion.
20. Dr. Osenbach opined that the bone spur found on Plaintiff's MRI was caused by degenerative factors, not neck sprain. Nothing on the MRI showed Plaintiff needed further surgery.
21. On redirect examination, Dr. Osenbach opined that the herniated disks operations Plaintiff had performed on his neck could be the cause of his continued neck pain. Dr. Osenbach testified that the stimulator was for arm pain, not neck pain. He opined that arm pain could be caused by compression of a nerve or bone spurs.
22. Defendants argue that during the period prior to his termination in December 2002, Plaintiff did not talk to his doctors about whether he could continue to perform his job, nor did he talk to Defendant-Employer about any further modifications to his job. Additionally, Defendants contend that Mr. Herron discussed with Plaintiff other mechanics positions that he could bid into which were less physical positions overall, including mechanics positions in the avionics, electrical, seat, and composite shops. Plaintiff did not consider bidding into any of these positions, although they were lighter positions. Defendant-Employer acknowledged, however, these positions were located in Charlotte, North Carolina and Plaintiff resides in Dunn, North Carolina.
23. Based on the greater weight of the evidence, the Full Commission finds that even assuming Plaintiff did not talk to his doctors about whether he could continue to perform his job, nor did he talk to Defendant-Employer about any further modifications to his job, Defendants had actual notice of Plaintiff's need for further job modification. Specifically, on Plaintiff's August 9, 2002 medical report to US Airways, Dr. Joan D. Potter stated that Plaintiff was unable to drive himself to work and his "sedating meds make adequate safe performance of job as airline mechanic extremely unlikely." Dr. Potter further stated that `Patient only capable of doing extremely simple task on current meds. No climbing. No lifting pushing or pulling more that 5 lbs. Not safe to drive or operate equipment."
24. On April 25, 1995, Plaintiff sustained a neck injury by accident arising out of and in the course of his employment as a result of a slip and fall. Plaintiff was medically unable to perform his job at the time of his termination on December 2, 2002. Due to his injury, Plaintiff has been incapable of working in any employment from December 2, 2002, and continuing, and is entitled to total disability compensation during said period. At the time of the hearing, Defendants were continuing to pay for Plaintiff's ongoing medical expenses. Defendants have also paid temporary total disability compensation from April 1, 2004 (the date on which Plaintiff was taken out of work by a treating physician) and continuing. Defendants are entitled to a credit for any disability compensation paid to after April 1, 2004. In addition, in November 2002, Defendants advanced Plaintiff the sum of $2,000.00 against future benefits, for which Defendants are entitled to a credit.
25. Plaintiff's average weekly wage is $1,004.65, resulting in the maximum compensation rate for 1995 of $478.00.
26. Plaintiff was incapable of working due to his compensable injury between December 2, 2002 and April 1, 2004, the time period in dispute. Plaintiff's termination for excessive absences was directly related to his compensable injury. Plaintiff has established just cause for his failure to provide a doctor's note for each day he missed from work due to severe pain and other conditions caused by his admittedly compensable injury.
27. The treatment provided to Plaintiff was reasonably required to effect a cure, provide relief or lessen his disability resulting from his April 25, 1995 work-related injury.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. On April 25, 2002, Plaintiff sustained an admittedly compensable injury to his neck arising out of and in the course of his employment with the Defendant-Employer as a direct result of specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's average weekly wage is $1,004.65, resulting in the maximum compensation rate for 1995 of $478.00. N.C. Gen. Stat. § 97-25(2).
3. Plaintiff was medically unable to perform his job at the time of his termination. Defendant has failed to establish Plaintiff was terminated from his employment for just cause as Plaintiff was terminated for excessive absences that were directly related to his compensable injury. Seagraves v. TheAustin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996).
4. As a result of his neck injury of April 25, 1995 and continuing neck pain, Plaintiff was incapable of earning wages in any employment from December 2, 2002 through the date of hearing before the Deputy Commissioner and continuing and is entitled to temporary total disability compensation during said period. N.C. Gen. Stat. §§ 97-2(9); 97-29.
5. Defendants are obligated to pay for all of Plaintiff's reasonably required medical treatment resulting from his neck injury of April 25, 1995, including past and future treatment, for so long as such treatment is reasonably required to effect a cure, provide relief and/or lessen his disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $478.00 from December 2, 2002, and continuing until further order of the Industrial Commission, subject to a credit for temporary total disability compensation already paid after April 1, 2004, and an attorney fee awarded hereafter. Any compensation that has accrued shall be paid to Plaintiff in one lump sum.
2. In November 2002, Defendants advanced Plaintiff the sum of $2,000.00 against future benefits, for which Defendants are also entitled to a credit, after deduction of attorney fees.
3. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff for reasonably necessary treatment related to his neck injury of April 25, 1995 when bills for the same have been submitted and approved through procedures adopted by the Industrial Commission, for so long as such treatment tends to effect a cure, give relief or lessen Plaintiff's disability.
4. An attorney fee of 25% of the compensation awarded Plaintiff is approved for Plaintiff's attorney and shall be paid as follows: 25% of the accrued compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney; thereafter Plaintiff's attorney shall receive every fourth check from the compensation due Plaintiff.
5. Defendants shall pay the costs.
This the 28th day of November 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER